Arnold L. Fein, J.
Compton Advertising Inc. (Compton), tenant, sues its landlord, Madison-59th Street Corp. (Madison), and landlord’s managing agent, Collins-Tuttle & Co. Inc. (Collins-Tuttle), for money damages and rescission or reformation of tenant’s lease on the grounds that (1) Compton was fraudulently induced to enter the electricity rider to the lease by misrepresentations by defendants upon which Compton relied, and (2) the electricity rider to the lease is illegal and against public policy because it violates the orders of the Public Service Commission of the State of New York (PSC) and the tariffs of Consolidated Edison Co. (Con. Ed.) filed with and approved by the PSC.
The first and second causes of action of the second amended *770 complaint based upon the alleged false representations seek damages of $350,000.
The third cause of action seeks rescission of the lease because of the alleged fraud and the illegality of the electricity rider.
The fourth cause of action seeks reformation of the lease for the same reasons.
The fifth cause of action seeks damages in the sum of $350,000 on the ground that in February, 1972, by agreement between the parties, Madison expressly waived its right to increased electrical rent based upon increases in Con. Ed. rates subsequent to February, 1972.
The sixth cause of action for damages is based on defendants’ alleged waiver by conduct in that from February, 1972 to December, 1974 Madison did not charge Compton any increased electrical rent founded upon Con. Ed. rate increases subsequent to February, 1972.
The seventh cause of action requests a declaratory judgment that the electricity rider is illegal and against public policy.
The eighth cause of action for money damages in the sum of $350,000, the alleged difference between what Compton has paid Madison under the electricity rider and the fair and reasonable value of the electricity used by Compton, is premised on the ground that the electricity rider is illegal and against public policy.
In addition to a general denial the answer interposes a counterclaim requesting the court to reform the lease if the electricity rider is found to be illegal.
The lease, dated April 30, 1969, executed on October 24, 1969, is for a period of 15 years from May 1, 1969 to April 30, 1986, at an annual rental of $1,053,000 ($87,750 per month).
The first paragraph of the electricity rider reads: "The rent reserved in the Lease between the parties hereto, executed simultaneously herewith, is payable monthly in advance at the rate of $87,750 per month; Tenant agrees that such rental shall be increased to the sum of $92,600 per month, and, for and in consideration of such increase in Tenant’s rent, Landlord, as an additional service, will supply Tenant with electricity. In the event Landlord’s electric rates are increased or decreased, that portion of the rent covering the electric service provided to Tenant by Landlord will be increased or *771 decreased in the same percentage as such rate increase or decrease.”
The electricity rider authorizes landlord to make surveys of the electric equipment and fixtures in tenant’s premises and tenant’s use of current to ascertain whether there has been an increase in consumption. If tenant adds equipment its rent is to be increased in an amount determined by landlord’s consultant, subject to arbitration if tenant disagrees. The rider also provides that if tenant removes or reduces the use of equipment or fixtures so as to require less electrical service the additional monthly rent shall be proportionately reduced.
Landlord is also authorized to terminate furnishing electricity to tenant. In such event tenant may apply directly to Con. Ed. for service. There is no provision permitting tenant the unilateral right to apply to Con. Ed. for service.
Plaintiff’s case is largely premised on landlord’s alleged violation of Public Service Commission regulation, opinion and order dated July 25, 1951, authorizing and approving the Con. Ed. tariffs filed with the PSC. The pertinent Con. Ed. tariff provides: "The Customer may redistribute or furnish electric energy for the use of his (non-residential) tenants or (nonresidential) occupants in the building or premises at which the Customer is supplied with electric service under this Service Classification, provided that the Customer shall not resell, make a specific charge for, or remeter (or submeter) or measure any of the electric energy so redistributed or furnished”.
The purpose of the tariff and the regulation was to bring about the discontinuance of the prior practice of submetering and reselling current for a profit. It was an attempt by the PSC and Con. Ed. and other utilities to put electric service on the same basis as gas service, elevator service, janitor service, heating, hot and cold water, refrigeration, interconnecting telephone service and the like. To the extent that such services are furnished by the landlord they are not separately charged or billed. The rent remains the same irrespective of the quantity or variation in the amount of such service utilized by the tenant. However, the rent necessarily must cover landlord’s cost for such services, although they are not separately billed or charged. Escalation clauses are commonly used in commercial leases to cover anticipated cost increases in long-term leases.
The PSC determination, approving the tariff permitting a landlord to distribute or furnish electric energy for the use of *772 his tenants, provided that landlord "shall not resell, make a specific charge for or remeter (or submeter) or measure any of the electric energy so redistributed or furnished” has been upheld as a lawful exercise of the Commission’s power (PSC decision, case No. 14279; Matter of Campo Corp. v Feinberg, 279 App Div 302, affd 303 NY 995; Matter of Trustees of Sailors' Snug Harbor v Feinberg, 285 App Div 22).
Despite the obvious purpose of the PSC and the Con. Ed. tariff to prohibit resale of electricity for the purpose of making a profit, the authority given to landlords to furnish such service to tenants necessarily implies that landlords are to be compensated for rendering such service. The standard means to accomplish this end is to include in the rent charged to the tenant a charge for electrical current, by way of a so-called rent inclusion provision. As noted, the lease under review fixes the annual rent for the entire space and adds a fixed charge for electricity, described as increased rent, subject to variations upward or downward upon the basis of increased or decreased use of space and equipment or increases or decreases in Con. Ed.’s charges to the landlord.
The real issue here is whether it is illegal and against public policy and in violation of PSC orders and Con. Ed. tariffs to include such a clearly identifiable charge for electric current, subject to the indicated variations.
Compton contends that this provision involves the resale of electric energy for a specific charge and for a profit, in violation of the order and tariff. Compton further contends that landlord represented that (1) the charge to Compton was what Compton would pay Con. Ed. for direct service; (2) landlord’s charge was based upon surveys made by it; (3) such representations were false and known to be false in that surveys in landlord’s possession, made by its experts, showed that Compton’s use of electricity was substantially less than claimed by landlord and the amounts Compton would have been required to pay Con. Ed. for direct service were substantially less than the increased rent for electric service inserted in the lease.
Compton further alleges that it relied upon such false representations in executing the rider to the lease and that it was damaged thereby to the extent of the difference between what Compton would have been required to pay Con. Ed. and the amounts actually charged.
Landlord asserts that the amount inserted in the rider was *773 based upon the going rate or market price in comparable buildings for comparable space in New York City, based upon square footage of space occupied and that Compton knew this as a consequence of Compton’s efforts to lease and remove to similar space in Manhattan. It contends that the figure arrived at was a result of bargaining in conjunction with the extended negotiations as to rent for the entire lease, and that there was neither a false representation by the landlord nor reliance by Compton upon any such alleged misrepresentation.
It is undisputed that during the years it was a tenant Compton’s rent was increased or decreased based upon its nonuse of some space, its elimination of some equipment and its addition of other equipment. In each case the change made related to the additional rent charged for electricity. In the same years Con. Ed. several times increased its rates to landlord. Prior to February, 1972 there had been two increases based upon increases in Con. Ed. rates. On this basis, from February, 1972 through November, 1974, Compton was billed the sum of $6,331.94 per month in increased rent, under the electricity rider, whereas the stated charge in the rider was $4,850 per month. However, Con. Ed.’s rate increases to the landlord on April 14, 1972, January 10, 1973, September 22, 1973, October 1, 1974, and March 8, 1974 were not passed on or billed to Compton, nor was Compton advised of them or of Con. Ed.’s rate decrease on April 1, 1974. However, other tenants were billed for the net increases.
No demand on Compton for an increase was made by the landlord until December 6, 1974, when Collins-Tuttle sent Compton an invoice covering the four accumulated rate increases effective April 14, 1972, January 10, 1973, September 22, 1973 and March 8, 1974. There was some confusion in the amount claimed. It was ultimately asserted to be $91,828.96. By the same notice, Collins-Tuttle advised Compton that its monthly electrical rent was to be increased effective January, 1975 from $6,331.94, which it had been paying, to $13,752.57.
Compton refused to pay the alleged arrears of $91,828.96 and refused to pay the increased monthly rental. Efforts to compromise having failed, Compton commenced this action. On the same day landlord commenced an eviction proceeding in the Civil Court based upon Compton’s failure to pay the $91,828.96 plus additional electrical rent allegedly accrued from December, 1974 to March, 1975. Compton’s motion to *774 remove the Civil Court action to this court and to consolidate it with Compton’s action in this court was denied and the denial was affirmed by the Appellate Division.
The parties then stipulated to discontinue the summary proceedings and to litigate the dispute in this action subject to Compton’s agreement to pay landlord over a 12-month period all sums the landlord claimed as additional electrical rent, Compton reserving its position that the payments were "grossly in excess of a fair electrical charge” and were being made "under protest without prejudice * * * reserving all of its rights including its rights to recover the said payments or any part thereof in the Supreme Court action.”
The case was tried on the basis of a written joint stipulation of facts, a supplement to joint stipulation of facts, agreed upon exhibits and oral testimony.
We deal first with the issue of illegality. As noted, it is clear that the PSC order and the Con. Ed. tariff prohibiting a resale or "specific charge for or remeter (or submeter) or measure * * * 0f * * * e¡ectric energy” by a landlord to a tenant for its purpose the elimination of any profit from furnishing or redistributing electricity. Measurement by whatever means is precluded as a basis for the charge. However it is equally clear that the PSC order and Con. Ed. tariff do not prohibit rent inclusion when the landlord provides such service. Patently the landlord must use some method of measurement and computation in fixing the charge to tenant to be included in the rent. Tenant contends that any method of rent inclusion which separates the charge for electricity from the rest of the rent and provides for its escalation or reduction depending upon increased or decreased use and increased or decreased rates by Con. Ed. to the landlord violates the PSC order. However, this ignores reality. Tenant suggests that a lawful technique would be the inclusion of a charge for electricity, not separately stated, coupled with annual dollar or percentage increases over the life of the lease. Such amounts would be negotiated approximations, based upon estimates rather than surveys attempting to measure actual usage and actual cost. The difficulty with tenant’s position is that such a procedure would not insure the elimination of a landlord’s profit for rendering electric service, nor protect the landlord against increases it would have to absorb as was the case under the prior lease between the parties. All that would happen is that the figures and computations would be so *775 concealed as to make it impossible or almost impossible to ascertain the amount allocable to electricity. Except for happenstance any technique or formula would involve profit or loss.
The plain fact is, as tenant concedes and landlord does not dispute, that the only way to insure against profit or loss by the landlord with respect to electricity is to require direct metering by Con. Ed. to the tenant. Although it is apparent that this requirement has been considered off and on by the PSC, it has not yet adopted any rule to that effect. It is noteworthy that in August, 1976, the PSC adopted a rule that henceforth, with respect to new residential construction, rent inclusion is not to be permitted and the charge to the tenant for electricity is to be based upon a metered charge direct from Con. Ed. to the tenant. Since there is no certain way to avoid landlord profit or loss on electricity without direct metering and the PSC has not seen fit to require direct metering in cases such as that at bar, it must be concluded that the procedure adopted by the landlord here is not illegal and does not violate the PSC regulation and order and the Con. Ed. tariff. The mere fact that a profit was made in this case is not dispositive of the question of illegality. Determination as to whether a procedure is illegal does not turn on whether a profit is made. Nor should illegality be found merely because the technique used to pass on the charge is open and not so complex or obscure as to make it difficult to ascertain and expose the existence of a profit. This would provide a reward for concealment. There is no illegality or violation of public policy or of the PSC regulation and Con. Ed. tariff.
If the PSC desires to accomplish the laudable objectives of eliminating profit on the resale of electricity and reducing the consumption of electricity because the direct impact of the charge upon the ultimate consumer will encourage conservation, it should adopt a rule requiring direct metering. This is within the province of the PSC, not that of the court.
Equally untenable is tenant’s contention that it was fraudulently induced to enter into the electricity rider. It is not now disputed that landlord had in its possession at least two surveys which indicated that had tenant purchased its electricity directly from Con. Ed., tenant’s rates and costs would have been substantially less than the rate demanded by landlord and inserted in the rider. Landlord’s assertions that *776 it did not know about these surveys when it determined the monthly figure are simply incredible, as is other testimony on this crucial issue on both sides of this case. The flexible and facile memories of some of the witnesses are not helpful to their respective causes.
Landlord’s contention that it relied on the going market rate of 45 cents per square foot as representing what Con Ed. would charge the tenant for direct service is untenable in the face of its own surveys. No one can fault the landlord for wishing to insure that it did not under charge for electricity as it had apparently done under the prior lease. Nor can anyone blame the tenant for seeking to keep the charges as low as possible. However it should be unnecessary to note that the testimony of witnesses should be as to what occurred, not what they hope will conform to the objectives of the litigation. Palpably square footage of space leased or used is no measure of the quantity of electricity used. The nature and amount of electrical equipment and its purpose and hours of operation are the true measure. Function not space is the true test. Landlord and tenant both must have known this. However, a square foot rate is an appropriate technique for charging for a service. Accordingly it cannot be concluded that tenant’s representative relied upon any representation as to what landlord’s surveys showed. It knew the basis used was 45 cents per square foot. Tenant knew that this was the going market rate from its own investigation, in seeking other space. Moreover, it could have made its own survey as it ultimately did.
Compton did not really rely upon Collins-Tuttle’s September 27, 1968 letter to the effect that the cost to Compton would be "equal to that which you would pay to purchase electricity directly from Con Edison.” There were extended negotiations between that date and execution of the lease on October 24, 1969. A plethora of information was available to tenant. It knew of the 45 cents per foot basis. There was no reliance by Compton on any false representation. The conversations between Gizerian on behalf of tenant and Messrs. Talbert, Wallenstein and Adelson of Collins-Tuttle do not establish misrepresentation and reliance. Moreover, there were negotiations thereafter, because of the increase in landlord’s ground rent. The ultimate figures were bargained amounts, a total package, including a $1,000,000 contribution by landlord for renovation of Compton’s space. There is no actionable fraud, *777 mutual mistake or mistake on one side and fraud on the other.
Accordingly no cause of action has been proved to recover damages for fraud or illegality or for rescission or reformation.
There remains the question of waiver. It is undisputed that from February, 1972, until December, 1974, despite five rate increases by Con. Ed., the landlord did not increase Compton’s electricity charges. Landlord gave no notice of the Con. Ed. increases. Nor did it demand that tenant pay an increase based thereon. This failure to demand an increase is particularly notable in the face of the two prior increases based on increases in Con. Ed. rates. In February, 1972, tenant raised a serious issue as to these increases, based on the Mayer survey made for tenant purporting to show that the charges to tenant were far in excess of what Con. Ed. would have charged for direct service. Tenant threatened suit, asserting it was "very incensed” because it was "lied to” during the lease negotiations as to the basis for the electricity charge. Talbert of Collins-Tuttle promised that future Con. Ed. rate increases would not be passed on. They were not passed on until December, 1974. In the interim Compton’s monthly electrical rent was reduced and a retroactive rent credit was given because Compton’s subtenant, IBM, had vacated its space. No reference was made to the Con. Ed. rate increases.
The suggestion of landlord that the Con. Ed. increases were not revealed or passed on during this period merely in order to avoid irritating the tenant during negotiations respecting escalation charges for other services is incredible, if not worse. It smacks of fraud to withhold secretly the claim for such increases, to be asserted later, in order to procure an advantageous resolution of the escalation dispute. It is plainly and simply unbelievable that such increases were not passed on if there was no agreement to that end. Landlords do not withhold demands for substantial increases to which they are entitled, based upon increased costs, unless there is some agreement or understanding waiving or surrendering the claim. Here there was an agreement to waive and neither billing nor demand for almost three years. There was a waiver by action and agreement. The intention to waive was manifest by the agreement to do so and the conduct of landlord consistent with such promise for almost three years. Landlord billed monthly at the prior rate for these years although it knew of *778 the increases. There was a deliberate informed relinquishment of a known right.
Proof of an executed oral modification of a lease is not precluded by section 15-301 of the General Obligations Law, despite a lease provision that it cannot be changed orally. (Velveray Corp. v Jolo Plastics Corp., 19 AD2d 69; Woollard v Schaffer Stores Co., 272 NY 304.) By reason of landlord’s waiver by agreement and action, Compton is entitled to recover the amount of the increases subsequently charged and collected without prejudice to Compton’s rights for the period February, 1972 through November, 1974, totaling $84,408.33, representing the difference between $6,331.94 per month and the amounts paid. Compton’s claim for $173,630.94 for this period is not supported by the record.
The principle applied in Velveray (supra) governs executed modifications only. To the extent that it is executory an oral waiver is insufficient to modify a written agreement containing a provision against oral modification. (General Obligations Law, § 15-301; Velveray Corp. v Jolo Plastics Corp., supra; Alcon v Kinton Realty, 2 AD2d 454, app dsmd 2 NY2d 836). Thus the waiver cannot be held to apply to the increased charges for the months after December, 1974, when the landlord demanded and billed for payment at the increased rate, commencing December, 1974, as well as payment of the increases allegedly due for the prior period from February, 1972 through November, 1974.
Accordingly, plaintiff is entitled to judgment against both defendants on the sixth cause of action in the sum of $84,408.33, with appropriate interest.
Since the seventh cause of action seeks a declaratory judgment that the electricity rider is illegal, the court is required to make a finding on this issue. The court finds that the electricity rider is not illegal. The judgment to be entered shall so declare.
The remaining causes of action in the complaint and the counterclaim of defendants are dismissed.