**CARR–GOTTSTEIN FOODS CO. and Safeway, Inc., Appellants,**

v.

**WASILLA, LLC, d/b/a Wasilla Shopping Center, LLC, Appellee.**

No. S–12010.

Supreme Court of Alaska.

May 16, 2008.

---

**42.** *Id.*

James N. Reeves and Michael A. Grisham, Dorsey & Whitney LLP, Anchorage, for Appellants.

Jeffrey M. Feldman and Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Approximately six years after a supermarket relocated a stand-alone liquor store to the supermarket's premises, the supermarket's landlord claimed that the move constituted a breach of the supermarket's lease. The superior court agreed. We reverse because the landlord's lengthy silence and other acts constituted a waiver of its right to insist on strict performance of the lease with respect to the relocation.

## II. FACTS

In the 1950s Larry Carr opened his first Carrs grocery store and Oaken Keg liquor

store. He expanded the businesses and in the 1970s merged them with Barney Gottstein's wholesale company. Thereafter several Carr–Gottstein companies were created, including Carr–Gottstein Properties (CG Properties), a real estate development company, and LABAR Co., a partnership. At all times relevant to this case CG Properties managed the commercial real estate owned by Carr–Gottstein entities, including LABAR.

One of the properties LABAR owned was the Wasilla Shopping Center. A Carrs supermarket and an Oaken Keg liquor store were two of the tenants in the Wasilla Shopping Center, and a Carr–Gottstein company owned them, too. The supermarket was in the main building of the shopping center while the liquor store was in a smaller, satellite building. In 1990 an investment group headed by Leonard Green bought the Carrs supermarkets and Oaken Keg liquor stores, but not the real estate on which they were located. LABAR remained the landlord of the Wasilla Shopping Center. The Green-controlled corporation that owned Carrs supermarkets after 1990 was eventually named Carr–Gottstein Foods Co. (CG Foods). The Oaken Keg stores were owned by Oaken Keg Spirit Shops, Inc., a wholly owned subsidiary of CG Foods.

As part of the sale, the supermarket lease for the Wasilla Shopping Center was renegotiated. Its term was twenty years subject to four successive renewal options of five years each at the option of the tenant. The liquor store lease of the satellite building was to expire in 1995. The use clause of the supermarket lease provided that the tenant would use the premises "for the principal purpose of conducting thereon a general food supermarket." It permitted the sale of items sold "in other general food supermarkets." Another clause of the supermarket lease prohibited the tenant from subleasing the premises without landlord consent.

Because Alaska law had disallowed grocery stores from selling liquor, Oaken Keg stores, including the one in the Wasilla Shopping Center, were physically separate from Carrs stores. In 1993 the Alcohol Beverage Control Board modified its interpretation of state liquor laws to permit closer physical proximity between retail establishments and liquor stores. In 1996, after the liquor store lease expired, CG Foods moved the liquor store in the Wasilla Shopping Center into part of the premises previously occupied by the supermarket. This relocation required physical alterations to the supermarket premises, including glass partitions and doors separating the liquor store from the supermarket. Electrical modifications were also made. CG Foods did not seek or obtain permission for the relocation from CG Properties. But CG Properties was aware of the relocation and made no objection that the relocation would violate either the use clause or the sublease clause. Denali Commercial Management, Inc., described as CG Properties' "management arm" with respect to the shopping center, facilitated the relocation by bidding on and billing for some of the electrical work required by the move—Denali billed CG Foods some $20,000 for electrical work.[1] After the relocation CG Properties required Oaken Keg's sales figures to be reported separately, but combined them with the supermarket's sales figures for the purpose of calculating whether percentage rent should be charged.[2]

In 1998 LABAR transferred ownership of the Wasilla Shopping Center to another Carr–Gottstein entity, Wasilla LLC. Wasilla LLC was also managed by CG Properties and in this opinion our reference to CG Properties should be understood to include both LABAR and Wasilla LLC.

In 1998 Wasilla LLC borrowed a large amount of money from a third party, using the Wasilla Shopping Center as security. In connection with this transaction, Robert

---

1. Two-thirds of the stock of Denali Commercial Management, Inc., was owned by Carr–Gottstein entities and one-third was owned by CG Acquisition Co., an investment company created by Green that later became CG Foods. Denali's president was Robert Mintz, the general manager of CG Properties.

2. The breakpoint for percentage rent was not met until the second quarter of 2001; until then no percentage rent was charged.

Mintz, CG Properties' general manager, signed a sworn statement that the leases in the shopping center were not in default.

In 1999 Green's investment group sold CG Foods to Safeway. As part of this transaction, Safeway asked about possible liabilities that CG Foods might have and sought estoppel certificates from CG Properties that would declare that there were no defaults under CG Foods leases except as stated.[3] CG Properties did not state that CG Foods was in default under the lease, but refused to sign the certificates. In February 2002, approximately six years after the relocation of the liquor store, CG Properties wrote Safeway that it considered the move to be a breach of the supermarket lease.

## III. PROCEEDINGS

A few months later CG Properties, acting through Wasilla LLC, brought this action against Safeway, CG Foods, and Oaken Keg Spirit Shops, Inc. (collectively Safeway). The complaint alleged that "several years ago" the liquor store had been relocated to a partitioned area of the supermarket without CG Properties' consent and that this violated the lease's use and sublease clauses. CG Properties sought declaratory relief and a permanent injunction preventing Safeway from operating an Oaken Keg liquor store on the supermarket premises.

Safeway answered and pled affirmative defenses including waiver, estoppel, and laches. CG Properties then filed an amended complaint, adding a claim for damages. Extensive motion practice and discovery followed.

CG Properties moved for partial summary judgment seeking a ruling that CG Foods had violated the use and sublease clauses. According to CG Properties, the use clause was understood by the parties to exclude the sale of liquor. Further, CG Properties argued that the sublease clause of the lease, which prohibited CG Foods from allowing "others" to use any part of the leased space without the landlord's written consent, in-

cluded wholly owned subsidiaries of CG Foods.

Safeway opposed the motion for summary judgment and cross-moved for summary relief. It argued that the use clause permitted the sale of liquor from within the supermarket premises. Safeway also argued that the sublease to Oaken Keg was not a breach of the lease because Oaken Keg was a wholly owned subsidiary of CG Foods and the parties treated the two corporations as a single entity. Both as to the use clause and the sublease clause, Safeway argued further that the parties' course of performance supported Safeway's interpretation of the lease. In addition, Safeway argued that CG Properties had waived its right to contend that Safeway was in breach of the use and sublease clauses because of CG Properties' long acquiescence in the move and its conduct and statements relating to the absence of defaults. On similar grounds, Safeway presented an argument relating to estoppel and laches.

Anchorage Superior Court Judge Morgan Christen granted CG Properties' motion for summary judgment concerning the sublease clause, holding that CG Foods "breached its duty to seek permission before sub-leasing a portion of the leased premises." The superior court implicitly denied Safeway's cross-motion concerning the sublease clause and expressly denied both parties' motions concerning whether the use clause was breached.

CG Properties then sought a ruling "to establish the law of the case regarding damages for defendants' violation of the sublease clause." CG Properties sought damages resulting from its inability to lease the satellite building on terms as favorable as those paid by Oaken Keg after Oaken Keg vacated the satellite building in 1996. CG Properties argued that Oaken Keg would not have moved from the satellite building to a location other than the supermarket premises, even though Oaken Keg had no duty to remain in the satellite building because its

---

**3.** The lease provided that if a party refused for ten days to execute an estoppel certificate after a formal request, which could be made "at any time," the requesting party had the authority to sign certificates on behalf of the refusing party.

Under this authority Safeway signed the certificates (stating there were no defaults) on CG Properties' behalf after the litigation began, but the superior court found this to be ineffective for the purposes of estoppel.

lease had expired. Over Safeway's opposition, the trial court ruled that CG Properties was entitled to recover lost rent and remodeling expenses pertaining to the satellite building, less an offset for rents actually received.

The court then ordered a trial in two phases. The first phase would be tried to the court and would concern issues relating to the use clause. The second phase would be a jury trial and would involve all other issues.

The court entered findings of fact and conclusions of law following the presentation of evidence for the first phase of the trial. The court concluded that the use clause did not permit the sale of liquor from the supermarket premises. The court also rejected Safeway's argument that CG Properties' delay in objecting to the move signified that CG Properties did not view the move to be a violation of the lease, notwithstanding finding that CG Properties' leasing director, Gale Bogle–Munson, knew of the move a few weeks before it happened. The court also found that when Mintz of CG Properties learned of the move after it occurred, he decided to keep his options open rather than notify CG Foods that it was in breach of the lease.[4]

The court next scheduled a jury trial on damages and on Safeway's affirmative defenses. But before the jury trial concluded the court ruled (1) that the lease precluded the affirmative defense of waiver, and (2) that the affirmative defense of estoppel would be submitted to the jury acting as an advisory jury.

The jury returned a special verdict finding that CG Properties suffered past damages as a result of the breach of the sublease clause of $172,490 and past damages for breach of the use clause of $50,028.78. The jury also found that CG Properties would suffer future damages flowing from the breach of the use clause of $47,847. But the jury also found that CG Properties was estopped from enforcing the use clause.[5]

Subsequently, the trial court rejected the jury's finding regarding estoppel, concluding that there "was not evidence of an unambiguous statement or action by Plaintiff that was inconsistent with Plaintiff's position at trial that the parties' lease did not permit the sale of alcohol on the supermarket premises." The court also concluded that the evidence did not support "a finding that Defendants relied upon any such statement or action by Plaintiff."

The court entered judgment in favor of CG Properties in the principal sum of $270,365.78 (the sum of the three awards made by the jury) plus prejudgment interest. The court also awarded CG Properties full attorney's fees and costs approximating $660,000.[6]

## IV. DISCUSSION

### A. Contentions on Appeal

On appeal Safeway raises issues pertaining to liability and damages and also challenges the award of full attorney's fees. In particular, Safeway argues that neither the sublease clause nor the use clause was breached and, alternatively, that CG Properties is barred by the doctrines of waiver and estoppel from claiming that they were. With respect to damages, Safeway contends that the claimed breaches were not the legal cause of any damage CG Properties may have suffered and further that duplicate damages were awarded. CG Properties offers counterarguments on all points. Because we conclude that CG Properties' claims for breach were waived as a matter of law, it is unnecessary to discuss the other points that Safeway has raised.

---

4. The court found that Mintz decided to "wait until he could assess the economic ramifications of the move before deciding how to proceed."

5. The jury was instructed that the essential elements of equitable estoppel were whether "(1) plaintiff asserted an unambiguous position, by conduct or by making a statement or statements, that is contrary to its contention in this trial that

[CG Foods] violated the use clause; and (2) that [CG Foods] reasonably relied on plaintiff's asserted position."

6. The court based the award of full fees on the language of a guaranty clause signed by Safeway that the court interpreted to call for such an award.

## B. Waiver

Safeway's argument concerning waiver is that CG Properties clearly manifested its acquiescence in the move of the liquor store onto the supermarket premises. Safeway also argues that no provision of the lease bars assertion of its waiver defense and if there were such a provision, it would be unenforceable. Safeway argues that the court erred with respect to its waiver defense by granting partial summary judgment to CG Properties concerning the sublease clause, and later by ruling that the lease precluded assertion of the defense. Safeway argues that the undisputed facts establish waiver as a matter of law; alternatively, it contends that there were genuine issues of material fact requiring a trial on the issue.

In reply CG Properties argues that the court's rulings were correct. It contends that a "no waiver" clause of the lease precluded the application of waiver. CG Properties argues further that if the clause is invalid, it is only so when the landlord seeks termination of the lease. Further, CG Properties argues that even if the no waiver clause is unenforceable, Safeway's waiver defense fails on the facts and that summary judgment in CG Properties' favor was properly granted.

■ When a party to a contract is aware of conduct on the part of the other party that constitutes a breach and fails to protest the breach while continuing to perform the contract, that party may be held to have waived its right to rely on the breach in subsequent litigation. The seminal case in Alaska on contract waiver is *Milne v. Anderson.*[7] In *Milne* we stated:

> Waiver is generally defined as "the intentional relinquishment of a known right." However, waiver is:
>
> a flexible word, with no definite, and rigid meaning in the law. . . . While the

term has various meanings dependent upon the context, it is, nevertheless, capable of taking on a very definite meaning from the context in which it appears, and each case must be decided on the facts peculiar to it.

A waiver can be accomplished either expressly or implicitly. An implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party. To prove an implied waiver of a legal right, there must be direct, unequivocal conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver.[8]

In later cases we added an objective gloss to this formulation. "[N]eglect to insist upon a right," we have said, may result in an implied waiver, or an estoppel, when "the neglect is such that it would convey a message to a reasonable person that the neglectful party would not in the future pursue the legal right in question."[9]

The *Milne* case offers a valuable illustration of how the general principles of implied waiver should be applied. *Milne* involved a contract to sell real estate.[10] The buyer, Milne, purchased land and buildings from the Andersons.[11] His offer contained language to the effect that all furnishings and fixtures on the premises would be included in the purchase. The Andersons, who resided outside Alaska, wrote in some exceptions to the offer specifying furnishings that they would retain. These terms were communicated to Milne's attorney but not, evidently, to Milne, and the warranty deed did not contain them. Later Mr. Anderson returned to Alaska and removed some personal property from the premises.[12] Milne observed him doing this,

**7.** 576 P.2d 109 (Alaska 1978).

**8.** *Milne,* 576 P.2d at 112 (citations omitted).

**9.** *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.,* 129 P.3d 905, 917 n. 35 (Alaska 2006) (citing *Wausau Ins. Cos. v. Van Biene,* 847 P.2d 584, 589 (Alaska 1993)).

**10.** *Milne,* 576 P.2d at 110.

**11.** *Id.* at 111.

**12.** *Id.* at 110–11.

asked what he was doing, but made no protest. Sometime later a bank official asked Milne to initial his approval to the language that the Andersons had added.[13] Milne refused, but made no complaint to the Andersons. Later Milne borrowed $4,000 from Mrs. Anderson in exchange for an unsecured promissory note. He made payments for awhile and then defaulted. When the Andersons' attorney sent him a demand letter, Milne did not claim that he was offsetting the balance of the note because of the property that had been removed from the premises. But he took that position at the trial of the suit to collect on the note. He also claimed that he had made certain utility payments before he took possession of the premises and these payments, too, should be offset. The trial court held that Milne had waived his right to claim these offsets.[14] On appeal we affirmed, noting that

> [t]here is substantial evidence in the record to support an inference of waiver: Milne's failure to complain about the utility payments and Mr. Anderson's activities on the premises; his failure to protest when he saw that the contract had been altered; his continued performance under the contract, despite his knowledge that the contract terms had been changed; and his failure to raise the claim of offset when Anderson's attorney demanded payment on the promissory note. Since, from our review of the record, we are not left with a "definite and firm conviction that a mistake has been made," the district court's finding that Milne waived any right to raise his claim for damages under the land sale contract in this litigation over the promissory note must be affirmed.[15]

In *Altman v. Alaska Truss & Manufacturing Co.*, we had occasion to apply the implied waiver principles announced in *Milne* in the context of a lease.[16] The property involved was owned by the State of Alaska and leased under a long-term lease to Altman.[17] Altman in turn had subleased part of the property to Alaska Truss & Manufacturing (ATM), which in turn assigned the sublease to Woods & Rohde, d/b/a Alaska Truss & Millwork Inc. (W & R).[18] A clause in the sublease provided that if the state increased its rate on the primary lease, the sublease rent would be increased by the same percentage.[19] On December 15, 1974, the state increased its rent by approximately 500 percent.[20] This increase occurred in a period during which Altman, ATM, and W & R were in a dispute as to what the appropriate rent should be for a five-year renewal of the sublease that began on September 30, 1973.[21] Although Altman was seeking a rent increase, he did not advise ATM or W & R of the 500-percent increase in the state's rent until September 1976, and even then he did not state that he intended to enforce the escalation provision.[22] Rather, he relied on the increased rent as a reason why ATM and W & R should agree to an increase. It was only in 1978 when Altman filed suit that he notified ATM and W & R that he intended to enforce the rent escalation clause.[23] The superior court held that Altman had impliedly waived his right to enforce the escalation provision.[24] On appeal we affirmed this conclusion:

> As we stated in *Milne v. Anderson*, "[a]n implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party." Altman's conduct in never insisting upon his right to enforce the escalation provision was incon-

13. *Id.* at 111.

14. *Id.* at 111–12.

15. *Id.* at 112–13 (footnote omitted).

16. *Altman v. Alaska Truss & Mfg. Co.*, 677 P.2d 1215, 1223 (Alaska 1983).

17. *Id.* at 1217–18.

18. *Id.* at 1215, 1217–18.

19. *Id.* at 1217.

20. *Id.* at 1218–19.

21. *Id.* at 1217–18.

22. *Id.* at 1218–19.

23. *Id.* at 1219–20.

24. *Id.* at 1220, 1223.

sistent with any other intention than a waiver of his right; furthermore, his neglect to insist upon his right resulted in prejudice to ATM and W & R. To have preserved his right under the escalation provision, Altman needed only to have notified ATM and W & R that he intended to enforce the provision. Altman did not do this until he filed his suit in 1978. We thus conclude that the superior court properly held that Altman is estopped from enforcing, and has waived his right to enforce, the escalation provision of the sublease.[25]

In at least two other cases we have held that a landlord has waived its right to rely on potential lease breaches by conduct amounting to acquiescence. Thus in *Fun Products Distributors, Inc. v. Martens* a tenant gave notice of lease renewal that was untimely under the terms of the lease and defective in other respects.[26] Thereafter the tenant continued to make monthly rental payments that were labeled "lease payments."[27] For some three years the landlord gave no notice that it considered the option to renew ineffective. The trial court held that the option to renew the lease was not effectively exercised and that the tenancy had become a month-to-month tenancy. On appeal this court reversed, holding as a matter of law that the landlord had waived its right to claim that the purported renewal was defective:

> We hold that as a matter of law where a lessor accepts lease payments for a substantial period of time (approximately three years) after receipt of a tardy notice of renewal, without advising the lessees that the late tender of notice was considered ineffective and without advising the lessees that the notice was ineffective because it was executed by only one of the lessees, the lessor has waived the lease requirement for notice by the lessees of renewal of or within a certain time.[28]

In *Dillingham Commercial Co. v. Spears*, the lessee sought to exercise a purchase option in the lease.[29] The lessor resisted on a number of grounds, one of which was that nearly every payment of rent over the nine-year history of the lease had been made late.[30] The landlord had accepted the late payments without objection but argued that a non-waiver clause preserved her right to object to the late payments. The clause provided: "Only waivers in writing executed by Landlord shall be effective. No delay or omission on the part of Landlord in exercising any of its rights shall operate as a waiver of such right or any other right."[31] We observed that if literally applied, this clause "would permit the landlord to accept late payment and still assert default of the lease." But we found that the non-waiver clause did not preclude the defense of waiver and that the superior court had correctly concluded that the landlord's "long acquiescence constituted a waiver of her right to claim a default for [the tenant's] late payments of rent."[32]

 Based on the above principles and our case law application of the doctrine of waiver, we agree with Safeway that the course of conduct of CG Properties in this case constituted implied waiver as a matter of law. CG Properties had advance knowledge of CG Foods' intent to move the Oaken Keg store onto the supermarket premises. CG Properties' management arm, Denali Commercial Management, assisted CG Foods in relocating the Oaken Keg. After the relocation, while requiring that the sales figures for the Oaken Keg be kept separate from those of the supermarket, CG Properties combined them for the purpose of calculating whether percentage rent should be charged to CG Foods. Thus, CG Properties had full knowledge of the relocation, and facilitated it, and also had full knowledge of the continued sales of liquor by the Oaken Keg store from within the supermarket premises. CG Properties' general manager, Mintz, upon learn-

**25.** *Id.* at 1223 (citation omitted).

**26.** 559 P.2d 1054, 1056–57 (Alaska 1977).

**27.** *Id.* at 1057.

**28.** *Id.* at 1058.

**29.** 641 P.2d 1, 2 (Alaska 1982).

**30.** *Id.* at 7–8.

**31.** *Id.* at 7.

**32.** *Id.* at 7–8.

ing of the relocation made a conscious decision not to protest it, preferring a wait-and-see approach in order to be able to select the most economically favorable choice as events unfolded. He maintained this posture for the better part of the next six years. Meanwhile, Mintz signed a sworn statement that "there are no defaults" in connection with the leases in the shopping center in order to obtain a large loan for CG Properties. In addition, at the time of Safeway's acquisition of CG Foods, Safeway sought information and a certificate as to whether CG Foods was in default on the lease. CG Properties had a duty to declare itself on that subject, but did not claim that a default existed. Instead it maintained its non-committal stance.

 These acts—except for the statement made to obtain the loan—prejudiced CG Foods and Safeway. Timely notice that the relocation violated the lease would have

afforded CG Foods the opportunity to reconsider its position. It could have declined to make the move—thus saving the expense of altering the supermarket premises—or sought to amend the lease.[33] Further, if Safeway had been told that CG Foods was in breach of its lease in the Wasilla Center— and had a potential six-figure liability to CG Properties—it could have declined to purchase CG Foods, offered a lower price, or sought a bond to protect it against potential damages. Because of CG Properties' failure to claim that the relocation breached the lease, CG Foods and Safeway had no occasion to pursue these options.[34]

This combination of acquiescence and assistance in the relocation, consciously declining to declare a breach, even upon request, and prejudice is inconsistent with any conclusion other than that CG Properties waived its right to claim that the lease was breached.[35]

---

**33.** When CG Properties first gave notice of the breach, on February 22, 2002, it offered a number of options that are like those that could have been explored six years earlier:

> We believe that either the lease should be renegotiated or the unapproved use should cease. Several options come to mind. You can move the liquor operation into a vacant space in the shopping center under a new Oaken Keg lease. Alternatively, you can amend the Carrs lease to add the sale of liquor as an approved use in exchange for an increase in Carrs minimum rent equivalent to the rent that would be paid were you to move the liquor store into its own space. Finally, you can amend the Carrs lease to allow the sale of liquor as an approved use in exchange for relinquishing the prohibition against the landlord leasing space in the shopping center to other liquor sellers. We are, of course, open to other suggestions you may have.

**34.** Preserving the opportunity to cure defects in performance and opening the way to settlement negotiations are two of the interests that underlie the statutory waiver provision of AS 45.02.607. Subsection (c)(1), which is section 2–607(3)(a) of the Uniform Commercial Code, requires a buyer of goods who discovers a breach to notify the seller within a reasonable time or be barred from a remedy. Such notice, we have observed, "provides the seller a chance to correct any defect," *Shooshanian v. Wagner*, 672 P.2d 455, 462 (Alaska 1983) (quoting *Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo.1980)), and "open[s] 'the way for normal settlement through negotiation.' " *Armco Steel Corp. v. Isaacson Structural Steel Co.*, 611 P.2d 507, 512 (Alaska 1980) (quoting U.C.C. § 2–607, Official Comment 4). The

rule requiring notice also is designed to "defeat commercial bad faith" by protecting "against stale claims arising out of transactions which a buyer has led [a seller] to believe are closed." *Id.*

**35.** This conclusion is supported by case law from other jurisdictions involving use clause violations acquiesced in by a landlord. *See Sol Apfel, Inc. v. Kocher*, 61 N.Y.S.2d 508, 512 (Sup.1946) (holding that lessor waived complaint for breach of lease by permitting lessee to carry on manufacturing operations from the outset without objection and aiding in the installation of necessary equipment for manufacturing); *Malley v. Thalheimer*, 44 Conn. 41, 1876 WL 1754, at *1–2 (Conn.1876) (holding lessor's complaint that lessee breached lease by adding a restaurant to a saloon waived because the lessor knew of lessee's alterations and expenditures fitting up the restaurant and did not object); *see also* MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7:3.6, at 7–78 to 7–79 & nn. 315–16 (Patrick A. Randolph, Jr., ed., 5th ed. 2007) ("Waiver may also occur by other behavior, as where with knowledge and without objection a landlord permits his tenant to make improvements or other expenditures in reliance and to his prejudice.").

These authorities and our own cases such as *Milne, Altman, Fun Products,* and *Dillingham Commercial* suggest that the traditional verbal formulation for implied waiver is not as demanding as it sounds. What the cases have in common is knowledge on the part of the party charged with waiver of facts giving rise to a right to assert a breach (or claim a contract benefit as in *Altman*), unreasonable delay in asserting a breach (or claiming a benefit), and acceptance of

## C. The Non–Waiver Clause Applies Only to Future Breaches.

 The non-waiver clause on which CG Properties relies states:

> The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the ... terms ... of this Lease ... shall not be construed as a waiver or relinquishment for the future ... of the right to exercise such right [or] remedy....

Under this clause, CG Properties' failure to insist on strict performance of the lease on one occasion does not waive its right to insist on strict performance on a future occasion. But this clause does not state that a failure to insist on strict performance on one occasion will waive the right to claim a default for the conduct on that occasion. The clause, if anything, implies that failure to insist on the performance of a right on one occasion will be a waiver of the right to declare a breach for that occasion. Thus, the non-waiver clause means that Safeway could not, in reliance on CG Properties' failure to insist on strict performance of the lease in connection with the Oaken Keg relocation, in the future move some other business onto the supermarket premises in violation of the use and sublease clauses. But nothing in the clause suggests that the waiver of these clauses as to the Oaken Keg move would be ineffective.

## V. CONCLUSION

Having concluded that CG Properties waived any right to claim that CG Foods breached the sublease or use clauses by moving the Oaken Keg liquor store onto the supermarket premises and that no provision of the lease prevents such a waiver from taking effect, we REVERSE the judgment of the superior court and REMAND this case for further proceedings consistent with this opinion.

BRYNER, Justice, not participating.

---

continued performance. Frequently there is also prejudice—often because failure to protest deprives the other party of an opportunity to cure—even if prejudice is not discussed. Little or no attention is paid to whether the party charged with waiver actually intended to relinquish a known right. At least one respected text, CALAMARI AND PERILLO ON CONTRACTS, recognizes the problems with the traditional formulation. The text says of the "voluntary and intentional relinquishment of a known right" definition that there are few, if any, more erroneous definitions known to the law. For one thing, waiver is far more multifaceted than this definition would allow for. Moreover, even as far as it goes, it is totally misleading. It strongly implies that the waiving party intends to give up a right. In reality, many, if not most waivers are unintentional and frequently do not involve a "right" that the party is aware of. JOSEPH M. PERILLO, CALAMARI AND PERILLO ON CONTRACTS § 11.29, at 458 (5th ed.2003).