Samuel SENGUL, Appellant
and Cross–Appellee,

v.

CMS FRANKLIN, INC. and Robert
Manus, Appellees and Cross–
Appellants.

Nos. S–13552, S–13582.

Supreme Court of Alaska.

Dec. 9, 2011.

John M. Rice, Law Offices of John M. Rice, P.C., Juneau, for Appellant/Cross–Appellee.

Paul M. Hoffman, Hoffman Silver Gilman & Blasco, P.C., Juneau, for Appellees/Cross–Appellants.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

In late April 2006 Samuel Sengul leased a commercial storefront in downtown Juneau to Robert Manus, who was acting on behalf of CMS Franklin, Inc. The building was under construction when Sengul and CMS entered into the lease agreement, but the lease provided that Sengul would deliver the property to CMS in a specified improved condition by the time the lease commenced on June 1, 2006. The lease also included a rent abatement provision, which is at issue in this case because the building was not in the promised improved condition until approximately June 8, 2006. Manus did not pay any rent, nor did he mention the rent abatement provision when he took possession of the building, when the lease commenced, or when he opened CMS's store in mid-June. Sengul finally demanded rent in late July, but Manus refused to pay, claiming abatement. In September, Manus had still not paid any rent, and Sengul put a lock on CMS's store door and placed signs demanding rent in the store windows. Manus had the lock cut off, but began to move the inventory out of CMS's store, vacating it and returning the keys to Sengul two days after the lockout. Sengul then sued CMS and Manus for unpaid rent.

The superior court determined that CMS had waived its right to rent abatement and owed Sengul unpaid rental amounts for the time that Manus had occupied the building. But the superior court also concluded that Sengul's lockout amounted to constructive eviction and awarded CMS damages as a refund for work performed on the premises that CMS was unable to benefit from after the constructive eviction.

We agree with the superior court that Sengul's actions constituted constructive eviction, but we disagree that CMS waived its entitlement to have the rent abated. We

remand for the superior court to recalculate the damages owed to CMS.

## II. FACTS AND PROCEEDINGS

### A. Facts

On or about April 30, 2006, Samuel Sengul and the president of CMS Franklin, Inc. (CMS), Robert Manus, entered into a five-year lease for part of a commercial storefront building in downtown Juneau. The building was still under construction when Sengul and CMS entered into the lease agreement. The parties apparently hoped that the storefront would be completed by mid-May 2006 in time for the beginning of the 2006 summer tourist season, but the lease contained certain provisions outlining how the lease terms would change if the storefront was not in a specified improved condition by the time the lease was set to begin on June 1, 2006. Several provisions of the lease are relevant to this appeal.

First, the lease provided: "Subject to completion of Landlord Work and vacant, 'broom-clean' delivery of Store Space 2 to Lessee, with a certificate of occupancy in place for the Building, this Lease commences on June 1, 2006." The term "Landlord Work" was defined in section 3.01(E) of the lease, which required Sengul to deliver the building to CMS in "[v]anilla box, finished condition." This included: four walls painted to CMS's color specification, the floor ready for carpet or wood tiling, a fully finished bathroom, and "[a]n official certificate for occupancy of the Building ... permitting [CMS's] use and occupancy."

The lease set the rent at $10,000 per month through May 31, 2007, with increases each year thereafter. CMS was to pay rent "commencing on the first day of the term of the lease." CMS also had to pay Juneau sales tax on the monthly rent, which amounted to an additional $500 per month. But the lease included a rent abatement provision:

> If Lessor's Work [defined in Section 3.01(E)] is not completed by May 15th, 2006, and the Leased Property is not delivered to Lessee in vacant, finished condition for Lessee's sole possession and improvements, then Lessor shall abate the rent per month for the first year of the lease by an additional 3 days for every day of delay. If the Leased Property is not delivered in vacant, finished condition with Lessor's Work completed by June 1, 2006, a rent abatement of 4 days will apply for each day the Leased Property is not finished to the standard set forth in Landlord's Work, E., below. If the Leased Property is still not delivered in finished condition with Landlord's Work completed by June 15, 2006, Lessee at its option, may cancel this Lease or continue to receive a 4 day abatement for each day of non-delivery.

In addition, the lease included terms and conditions related to default. It defined default as including failure to pay rent within ten days of Sengul providing notice that rent was due. And it provided that upon default, Sengul, "in addition to any rights and remedies that may be given ... by statute," could "choose to do the following, singly or in combination: (a) After legal process on notice, reenter the Leased Property and take possession thereof and remove all property from the same, except inventory." Finally, the lease contained a provision regarding waiver, which stated:

> No failure by either Lessor or Lessee to insist upon the strict performance by the other of any covenant, agreement, term, or condition or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such covenant, agreement, term, or condition.

CMS took possession of the building on or about April 30, 2006. At that time, contractors were still working on the building and, among other things, there was no certificate of occupancy. Over the next few weeks, a contractor made repairs and adjustments to both Sengul's and CMS's retail spaces in the building. Due to issues with the sprinkler system, Sengul was unable to obtain a certificate of occupancy for the storefront until June 8. Sengul opened his store that same day, but CMS did not open its store until about a week later, apparently because it was waiting for the contractor to finish certain improvements to the space.

Though CMS occupied the storefront for the next month and a half, it did not make

any rent or security deposit payments to Sengul. According to Sengul, he and Manus spoke two or three times in June and July, and Manus stated: "I know I'm late. I'm going to pay you in full, and I'm going to make it up to you." Manus, however, claims that Sengul did not ask for rent until late July and alleges that he responded that CMS did not owe any rent because the building was not ready until mid-June, and thus the rent was abated.

On July 25 Manus sent a letter to Sengul's attorney, contending that rent should have been abated due to the delay in having the building ready; he conceded that CMS owed Sengul the security deposit. Sengul's attorney responded to Manus in August, explaining that Manus was not entitled to rent abatement because, "[b]y accepting possession of the property and failing to provide any sort of notice to Mr. Sengul[,][CMS] . . . waived any right it may have had to a penalty under section 3(D) of the lease." The letter also warned that if CMS did not pay the full amount of rent and security deposit within ten days, Sengul would consider the lease in default and would seek all legal remedies, including eviction. Manus replied to Sengul's attorney on August 16, again claiming that the rent should have been abated and offering to pay $8,000 to remain in the storefront through the end of September.

On September 4, 2006, Manus or one of his staff arrived at CMS's store to find that Sengul had placed a cable lock on the front door. Manus immediately called a contractor, who came to the store and broke the lock. Manus was locked out of the store for a couple of hours before the contractor cut the lock off. Sengul also placed signs in CMS's store window reading "Your Rent is Due. Pay it" and similar statements. Manus testified that whenever he tried to remove the signs, Sengul or his staff would put them back up. Sengul also allegedly threatened to put the lock back on the door the next day.

Manus began moving CMS's inventory from Sengul's building to another store location down the street later that same day. The next day, CMS's attorney sent a letter to Sengul's attorney, claiming that "[w]ithout notice or cause, [Sengul] on Monday improperly and illegally padlocked the premises; by doing so precluded CMS access to inventory; [and] committed slander and committed tortious interference with CMS's business activities and contracts." CMS's attorney informed Sengul's attorney that CMS was moving out of the building and that Sengul could pick up the keys the next day. Manus removed the entire inventory from the store before the end of the day on September 6.

The storefront space CMS had leased remained vacant from September 6 until May 2007. In May 2007 Sengul leased the space to another tenant for $14,800 per month, approximately the same amount that CMS would have owed beginning in June 2007 pursuant to the lease had CMS continued to rent the space.

## B. Proceedings

On September 13, 2006, Sengul sued CMS and Manus. Sengul claimed that CMS was liable for the full amount of lease payments over the five-year term of the lease.[1] CMS responded that the rent should have been abated because it could not open for business until mid-June, and that Sengul constructively evicted CMS in September. CMS also counterclaimed for breach of contract, intentional interference with prospective business, breach of the implied covenant of good faith and fair dealing, and defamation.

On January 14, 2009, the superior court held a bench trial. The superior court explained that CMS had been entitled to rent abatement, but found that Manus had waived this right by failing to raise the issue with Sengul earlier in the course of the lease. The superior court thus concluded that CMS owed rent for June, July, August, and part of September.

Turning to the alleged constructive eviction, the superior court observed that Sengul's self-help actions of locking CMS's store door and placing signs in the windows were, although permitted by statute, prohibited pursuant to the terms of the lease. The superior court concluded that CMS had been

1. Sengul also alleged that Manus should be individually liable for any debts of CMS.

constructively evicted as of September 6 when Manus returned the store's keys to Sengul.

Thus, while Sengul was awarded the value of the unpaid rent ($33,570 [2]), the superior court awarded CMS damages equal to the cost of renovating the storefront space because "these improvements would have been of value to [CMS] but for the constructive eviction." The superior court calculated the amount of CMS's improvements as $53,365.09, offset that amount by the unpaid rent owed to Sengul, and awarded CMS $26,795.09, plus costs and prejudgment interest. Sengul appeals, and CMS cross-appeals.

## III. STANDARD OF REVIEW

 Whether a party's actions constitute constructive eviction is a mixed question of fact and law; we apply our independent judgment to the question of law and review the trial court's factual findings for clear error.[3]

 Questions of contract interpretation are questions of law that we review de novo, but findings of fact on questions created when the meaning of contract language is dependent on conflicting extrinsic evidence are reviewed for clear error.[4]

 A superior court's determination whether waiver occurred is a question of fact that we review for clear error.[5]

## IV. DISCUSSION

Sengul argues that the superior court: (1) erroneously concluded that the lockout con- stituted constructive eviction; (2) erroneously found that CMS made improvements to the storefront that justified a damages "set- off"; (3) failed to determine Manus's person- al liability; and (4) improperly calculated damages. In response, CMS maintains on cross-appeal that the superior court incor- rectly determined that it had waived its enti- tlement to rent abatement. We consider the constructive eviction issue and the waiver issue in turn.

### A. Sengul Constructively Evicted CMS.

The superior court concluded that Sengul constructively evicted CMS by "[p]adlocking Manus'[s] door and advising that he would do it again the next day, along with posting multiple 'pay up' signs on [the] store's win- dows." Sengul asserts that he had a right to take these actions as detainer [6] and main- tains that his actions did not constitute the type of substantial interference that would amount to constructive eviction. We cannot agree. Under the terms of the lease Sengul had no right to lock CMS out as an act of detainer, and physically excluding CMS from the building amounted to constructive, if not an actual, eviction.

#### 1. Sengul had no right to lock CMS out under the lease's terms.

 Alaska Statute 09.45.690, which ap- plies to commercial leases,[7] states: "Unless otherwise provided in the lease, a landlord has a right to re-enter leased premises when a tenant fails to pay rent, and may bring an action to recover the possession of the prem- ises." [8] Sengul appears to rely on this provi-

---

2. $10,500 for the months of June, July, and Au- gust, and six days' worth of rent at $345 per day for September 1 through September 6.

3. *See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

4. *Norville v. Carr–Gottstein Foods Co.*, 84 P.3d 996, 1000 n. 1 (Alaska 2004) (holding that ques- tions of fact are created when the meaning of contract language is dependent on conflicting extrinsic evidence); *Ben M.*, 204 P.3d at 1018 (stating that trial court's factual findings are re- viewed for clear error).

5. *Miscovich v. Tryck*, 875 P.2d 1293, 1302 (Alas- ka 1994) (citing *Fun Prods. Distribs., Inc. v. Mar-*

*tens*, 559 P.2d 1054, 1058 (Alaska 1977); Alaska R. Civ. P. 52(a)).

6. Detainer is a term of art defined as "[t]he action of detaining, withholding or keeping in one's possession." Bryan A. Garner, A Dictionary of Modern Legal Usage 270 (2d ed.2001).

7. Presumably AS 09.45.690 applies only to com- mercial leases; in 1974 the Alaska legislature passed AS 34.03.250(b), which explicitly abol- ished distraint for rent.

8. AS 09.45.690; *see also Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991) (ex- plaining that a landlord could engage in a self- help remedy in response to the tenant's nonpay-

sion, arguing without citation to any legal authority that he "had a clear right to detainer since this was a commercial lease."

The superior court recognized the availability of a self-help remedy under this statute; however, focusing on the phrase "[u]nless otherwise provided in a lease," the superior court turned to the lease between Sengul and CMS. In relevant part, the lease states that in the event of CMS's unpaid rent Sengul was permitted to, "in addition to any rights and remedies that may be given to [him] by statute . . . *[a]fter legal process on notice*, reenter the Leased Property and take possession thereof." (Emphasis added.) The superior court reasoned that "[i]f the intent of the lease were to allow reentry/seizure of the premises without legal process or notice, there would be little reason" for the "after legal process on notice" clause. Thus, the superior court concluded that Sengul "lacked authority to simply padlock the doors of [CMS's] store without some 'legal process,' particularly as the parties were still attempting to reach resolution of their dispute." We agree with the superior court that, reading the statutory provision and the lease terms together, Sengul did not have a right to lock CMS out for nonpayment of rent without prior legal process.

## 2. Sengul's actions constituted constructive eviction.

 Constructive eviction is a defense to a landlord's action for payment of rent.[9]

We have explained that a tenant can invoke a constructive eviction defense when there has been a substantial interference with the tenant's use of the leased premises.[10] To claim constructive eviction a tenant must: (1) notify the landlord of the interference; (2) give the landlord a chance to remedy the problem; and (3) vacate the property within a reasonable time.[11] Here, it is undisputed that Sengul was notified of the interference because he was the one who caused it. Sengul did not remedy the problem; instead Manus had to call a contractor to remove the lock from CMS's store door. Manus moved CMS's inventory and returned the key to Sengul by September 6, two days after the lockout.[12]

 Sengul maintains that his actions were "simply not enough" to substantially interfere with CMS's possession of the property. The superior court disagreed, concluding: "Padlocking [CMS's] door and advising that he would do it again the next day, along with posting multiple "pay up" signs on a store's windows[,] constitutes substantial interference with [CMS's] use of the leased premises." The superior court thus determined that the constructive eviction was effective as of September 6, 2006.

To support his claims on appeal, Sengul cites *King v. Petroleum Services Corp.*, where we held that a landlord's actions in reentering a leased premises did not substantially interfere with the tenant's use of the premises.[13] But as CMS points out, the situation in *King* was markedly different. In *King*, the tenant had already abandoned the

---

ment of rent because the lease at issue "expressly permit[ted] the lessor to re-enter the property upon the lessee's failure to pay rent").

9. *Hrubes v. Smith*, Mem. Op. & J. No. 626, 1992 WL 12549972, at *2–3 (Alaska, June 30, 1992) (citing RESTATEMENT (SECOND) OF PROPERTY § 5.4 & cmt. b (1977)).

10. *King v. Petroleum Servs. Corp.*, 536 P.2d 116, 120 (Alaska 1975); *see also* 3 MILTON R. FRIEDMAN & PATRICK J. RANDOLPH, JR., FRIEDMAN ON LEASES § 29:3.1 (5th ed. 2011) ("Constructive eviction is defined as any disturbance by landlord . . . that (1) renders the leased premises unfit for the purpose leased, or (2) deprives the tenant of the beneficial enjoyment of the premises.") (internal citation omitted).

11. *Hrubes*, 1992 WL 12549972, at *3; *see also* 3 FRIEDMAN & RANDOLPH, *supra* note 10, § 29:3.1 (explaining that "[i]t is not a constructive eviction unless tenant surrenders possession of the premises, and does so within a reasonable time after the condition arises").

12. Sengul appears to imply that Manus vacated the storefront on September 6 because the tourist season was over, not because of the lockout. But both Sengul and Manus testified that the tourist season lasts until late September, and Manus added that the last weeks of the season are important because vendors try to sell all of their inventory to avoid paying to ship it back. There is no evidence that Manus would have closed his store on September 6 but for Sengul's actions.

13. 536 P.2d at 120.

premises and the landlord's reentry "was primarily to safeguard [the tenant's] property and was not the cause of [the tenant's] abandonment of the premises."[14] We thus reasoned in *King* that there was "no evidence . . . of actual interference with [the tenant's] use of the leased premises."[15] But in this case CMS had not abandoned the storefront before being locked out, and Sengul's actions certainly were not intended to safeguard CMS's property. Clearly, Sengul did actually interfere with CMS's use of the property by locking the store's door and preventing Manus, his staff, and potential customers from entering the store during business hours.[16] Sengul testified that this was his exact intent in executing the lockout—to "prevent [Manus] [from] coming in."

▉ We agree with the superior court that Sengul's actions constituted at least a constructive eviction. Indeed, a physical exclusion from leased premises, such as a lockout, is an oft-cited example of an *actual* eviction. "An actual eviction of the tenant is a physical exclusion of the tenant from access to the leased premises, *for example, by locking the tenant out of the premises.*"[17] Courts in other jurisdictions have agreed that a landlord's physically excluding a tenant from the premises is an actual eviction.[18]

While neither party argued that CMS was actually evicted, the fact that a lockout generally is an example of an actual eviction supports CMS's constructive eviction claim because constructive eviction arguably broadens the circumstances in which a tenant may invoke an eviction defense: "Interferences by the landlord *that fall short of a physical exclusion,* but that nevertheless substantially interfere with the tenant's enjoyment of the premises, causing the tenant to vacate, are actionable by the tenant as 'constructive' evictions."[19] As one treatise explains, the related doctrines of the covenant of quiet enjoyment and constructive eviction "evolved historically from a protection against physical expulsion into a protection against interference by or through the landlord with the beneficial enjoyment of leased premises."[20]

**14.** *Id.*

**15.** *Id.; cf. Hrubes,* 1992 WL 12549972, at *3 (determining that ineffective repairs resulting in a "known structural susceptibility to earthquakes" was a substantial interference with a lessor's intended use of subleasing the building and upholding a superior court's finding of constructive eviction).

**16.** The record also suggests that Sengul may have physically stood in the doorway to prevent Manus's handyman from removing the padlock.

**17.** 2 RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY § 16B.02[2][a] (Michael Allan Wolf, ed., 2010) (emphasis added); *see also* DAVID S. HILL, LANDLORD AND TENANT LAW IN A NUTSHELL 26 (3d ed. 1995) ("To constitute an actual eviction there must be a wrongful physical expulsion or exclusion of the tenant from the leased premises by the landlord. For example, where a landlord physically bars a tenant from entering the premises, or . . . padlocks the entrances to the premises, there has been an actual eviction [and] the tenant's liability for all rent is suspended.").

**18.** *See, e.g., Turks Head Realty Trust v. Shearson Lehman Hutton, Inc.,* 736 F.Supp. 422, 428 (D.R.I.1990) (holding that plaintiff wrongfully evicted defendant when it changed the locks on defendant's commercial building and citing Rhode Island law that "any intentional act or conduct by the landlord . . . which deprives a lessee of his or her rightful possession constitutes

an eviction"); *Village Commons, LLC v. Marion Cnty. Prosecutor's Office,* 882 N.E.2d 210, 216 (Ind.App.2008) (determining that landlord's instructing a tenant to vacate a space prone to water damage constituted an actual eviction, which the court defined as "when the tenant is deprived of the occupancy of some part of the demised premises") (citation omitted); *Echo Consulting Servs., Inc. v. North Conway Bank,* 140 N.H. 566, 669 A.2d 227, 229 (1995) ("The landlord's actual physical dispossession of the tenant from the leased premises constitutes an actual eviction, either total or partial."); *Barash v. Penn. Terminal Real Estate Corp.,* 26 N.Y.2d 77, 308 N.Y.S.2d 649, 256 N.E.2d 707, 710 (1970) ("[W]here the landlord changes the lock, or padlocks the door, there is an actual eviction.").

**19.** 2 POWELL & ROHAN, *supra* note 17, § 16B.03[1] (emphasis added); *see also* RESTATEMENT (SECOND) OF PROP : LANDLORD & TENANT § 6.1 reporter's note 2 (1977) ("The common law has recognized two types of eviction: actual eviction, in which the landlord deprives the tenant of physical possession of the leased property, and constructive eviction, in which the landlord so deprives the tenant of the use of the property that his action *is tantamount to depriving the tenant of physical possession.*") (emphasis added).

**20.** 3 FRIEDMAN & RANDOLPH, *supra* note 10, § 29:1; *see also* 49 AM JUR.2D *Landlord and Tenant* § 515 (2011) ("[T]he ancient rule of the common law

Just as a lockout is a traditional actual eviction claim, classic constructive eviction cases are often based on circumstances such as failure to repair a premises,[21] and the doctrine is "broad enough to include many different situations where the whole or a substantial part of the premises is rendered unfit for the purpose for which is was leased." [22] It would make no sense for us to recognize that Sengul's lockout of CMS was an actual eviction but decline to uphold the superior court's constructive eviction determination. Thus, Sengul's lockout, which was a physical exclusion of CMS, was a substantial interference with CMS's use of the storefront and at the very least constituted constructive eviction.

## B. CMS Did Not Waive Its Right To Rent Abatement.

CMS argues on cross-appeal that it had a right to abate the rent, that it did not waive this right, and that it owed no unpaid rental amounts at the time of the constructive eviction.[23] The superior court found that CMS had been entitled to a rent abatement under the terms of the lease. The superior court then discussed whether CMS waived this entitlement. Weighing against waiver, the superior court recognized that the lease contained a non-waiver clause, that it was unclear that Sengul could have remedied the defects had Manus mentioned them earlier, and that Sengul did not bring up abatement when he delivered the property to Manus in an unimproved condition. But the superior court ultimately concluded that CMS waived its entitlement to abatement based on "[t]he

combination of consciously declining to timely invoke the rent abatement lease provision, promises to pay rent (that [Manus] only later claimed he did not owe), and prejudice to Sengul in being left unable to timely respond and potentially remedy claimed defects." CMS disagrees, arguing that the finding of waiver was erroneous because the lease's non-waiver provision precluded a finding of implied waiver, and because the language in the lease made abatement mandatory such that Manus did not have to mention the clause to Sengul to invoke abatement.

## 1. The non-waiver clause and the mandatory language of the rent abatement provision indicate that CMS did not waive its entitlement to rent abatement.

As the superior court recognized, neither the fact that the lease included a non-waiver provision, nor the mandatory language of the abatement provision, absolutely precludes the conclusion that CMS waived its right to abatement. Neither, however, does our case law demand that waiver be found in this case.

The superior court relied upon *Carr–Gottstein Foods Co. v. Wasilla, LLC*[24] to support the finding of a waiver. In that case, a tenant shopping center moved a liquor store closer to a supermarket without obtaining permission from its landlord.[25] The landlord was aware of the relocation and made no objection, even bidding on electrical work for

---

21. Eugene L. Grant, *Disturbing Concepts: Quiet Enjoyment and Constructive Eviction in the Modern Commercial Lease*, 35 Real Prop. Prob. & Tr. J. 57 (2000) ("[A] modern constructive eviction occurs when a landlord's acts substantially deprive a tenant of beneficial enjoyment of the premises, including access to ... goods and services.... The most common ground for constructive eviction claims probably is a landlord's failure to repair defects in the premises.").

22. 3 Friedman & Randolph, *supra* note 10, § 29:3.1 (collecting examples of conditions sufficient to support constructive eviction actions, including "landlord's failure to repair the leased premises," "landlord's failure to supply essential services," "periodic flooding," "mold and mildew problems," and "interference with access, easements, and deprivation of light and air") (internal citations omitted).

23. Sengul did not file a reply brief and did not address these issues in his opening brief.

24. 182 P.3d 1131 (Alaska 2008).

25. *Id.* at 1133.

the relocation.[26] Six years later, the landlord informed the supermarket that it considered the liquor store relocation to be a breach of the lease.[27] *Carr–Gottstein* is not directly applicable here because the non-waiver provision in that case dealt expressly with the waiver of future rights or remedies based on a prior, single instance of waiver, not waiver of the immediate breach as in this case.[28]

In *Dillingham Commercial Co. v. Spears,* we considered a non-waiver clause similar to the one in this lease and held that the non-waiver clause did not foreclose waiver; one party's "long acquiescence constituted a waiver of her right" even though the contract included a general non-waiver provision.[29] Here, the time between the signing of the lease and Manus's first mention of the abatement provision was less than three months, and the time lapse between the start of the abatement period (May 15) and Manus's first mention of abatement was even less[30]—a little over two months. Although the dissent emphasizes that those months were at the height of the summer tourist season, the key inquiry in *Dillingham* was whether one party's acquiescence "lulled [the other party] into inaction."[31] After nine years of late payment of rent without objection from the landlady, we concluded in *Dillingham* that the tenant was lulled into a belief that such lateness was acceptable.[32] Here, however, it is unlikely that Manus's failure to mention the abatement provision "lulled" Sengul into delaying getting the certificate of occupancy because Sengul had his own independent motivation to obtain the certificate (opening his own store), and because he did in fact obtain the certificate and open his own store as soon

as the building was in compliance on June 8. Therefore, while the superior court was correct that a non-waiver clause does not always bar a finding of implied waiver, because there was no unreasonable acquiescence on CMS's part in this case, the non-waiver provision supports CMS's argument that it did not waive its entitlement to abatement.

The superior court also found it important that Manus "did not invoke or mention the rent abatement provision of the lease to Sengul until raising it in late July, when Sengul began pressing for payment of rent." The superior court added that "although the rent abatement provision was a specifically-negotiated part of the lease, Manus gave no notice of his intent to rely on the provision until he received the first demand for rent." We conclude that notice was not required based upon the plain language of the lease.

In relevant part, the abatement provision's language states that "Lessor *shall* abate the rent" and "a rent abatement of 4 days *will* apply"; the lease defines the words "shall" and "will" as mandatory. CMS maintains that this language indicates that abatement was "self-executing" and therefore CMS did not have to provide Sengul with notice that CMS intended to rely on it. CMS thus contends that Manus did not mention abatement until Sengul demanded rent in late July because Manus assumed that both parties understood that the rent was being automatically abated. The mandatory nature of the rent abatement provision is evident from the plain language of the lease. And though we have held that a party can implicitly waive its contractual rights regardless of the self-exe-

---

26. *Id.*

27. *Id.* at 1134.

28. *Id.* at 1140 (concluding that "[t]he clause, if anything, implies that failure to insist on the performance of a right on one occasion *will* be a waiver of the right to declare a breach *for that occasion*") (emphasis added).

29. 641 P.2d 1, 7–8 (Alaska 1982) (concluding that a landlady waived her right to claim a default despite the presence of a non-waiver provision where the landlady accepted late rental payments from the tenant for nine years without complaint and only mentioned the tenant's

breach when the tenant tried to exercise the lease's purchase option).

30. Though there is some evidence that Manus may have indirectly raised abatement in emails sent in April and May, the superior court found that Sengul credibly testified that he did not receive either email, neither email specifically mentions abatement, and CMS does not mention either email in its appellate brief.

31. *Dillingham Commercial Co.,* 641 P.2d at 8 n. 10 (quoting *Summa Corp. v. Richardson,* 93 Nev. 228, 564 P.2d 181, 185 (1977)).

32. *Id.* at 7–8.

cuting language of a contract provision,[33] we conclude that in this instance CMS's conduct was insufficient to amount to an implied waiver.

### 2. CMS's words and conduct did not result in an implied waiver.

We established in the seminal case of *Milne v. Anderson* that waiver of a contractual right may be either express or implicit, and that an implied waiver "arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party."[34] We explained that implied waiver may be demonstrated by either: (1) "direct, unequivocal conduct indicating a purpose to abandon or waive the legal right," or (2) "acts amounting to an estoppel by the party whose conduct is to be construed as a waiver."[35] But we have cautioned that "the standard for an implied waiver is high and factual findings are required."[36]

When analyzing the first way that Manus could have implicitly waived CMS's entitlement, the superior court found that Manus made "promises to pay rent (that he only later claimed he did not owe)." Sengul testified that he had at least two conversations with Manus in June and July where Manus stated: "I know I'm late. I'm going to pay you in full, and I'm going to make it up to you"; "I know I'm late, but I'll pay it"; and "I know I owe you, and I'm late, but I'll make it up." But these statements, even as Sengul relates them, are ambiguous regarding what Manus meant by "pay you in full," "I'll pay it," and "I owe you." Aside from rental payments, Manus owed Sengul a security deposit that he had not paid. Thus, Manus's statements that he owed Sengul and

would pay "it" cannot be construed as "direct, unequivocal conduct" indicating that Manus intended to waive his right to abatement.

But aside from direct, unequivocal conduct, Manus could also have implicitly waived CMS's entitlement to abatement through estoppel. In this context, estoppel exists when there is "assertion of a position by word or conduct, reasonable reliance thereon by another party, and resulting prejudice."[37] This is an objective test; "neglect to insist upon a right only results in an estoppel" when a party's words or conduct "would convey a message to a reasonable person that the neglectful party would not in the future pursue the legal right in question."[38] Here, we do not need to reach the first two prongs of the estoppel inquiry—asserting a position and reasonable reliance—because we conclude that the superior court's determination that Sengul was prejudiced by Manus's failure to explicitly invoke his right to abatement earlier than late July was error.

Sengul claimed that "[i]f Manus had indicated that there was a problem then Sengul would have had an opportunity to do something to ensure the penalties would not apply[,] such as ... having the contractor focus solely on finishing [CMS]'s store." The superior court, apparently looking to this statement, found that Manus's failure to mention abatement prejudiced Sengul because he was "left unable to timely respond and potentially remedy claimed defects." But this finding is inconsistent with at least two other findings made by the superior court: that the earliest Manus could have opened his store was June 8, when the temporary certificate of occupancy was issued, and that the delay in obtaining the certificate "was tied to problems with the

---

**33.** *See Altman v. Alaska Truss & Mfg. Co.*, 677 P.2d 1215, 1223 (Alaska 1983).

**34.** 576 P.2d 109, 112 (Alaska 1978); *see also Carr–Gottstein Foods Co.*, 182 P.3d 1131, 1136 (Alaska 2008) ("When a party to a contract is aware of conduct on the part of the other party that constitutes a breach and fails to protest the breach while continuing to perform the contract, that party may be held to have waived its right to rely on the breach in subsequent litigation.").

**35.** *Milne*, 576 P.2d at 112.

**36.** *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 917 (Alaska 2006).

**37.** *Wausau Ins. Cos. v. Van Biene*, 847 P.2d 584, 588 (Alaska 1993).

**38.** *Id.* at 589.

sprinkler system—beyond Manus' control or obligation as a tenant." [39] The testimony of Sengul's contractor confirms that the delay in obtaining the certificate of occupancy was due to the building's sprinkler system and fire alarms, neither of which were within CMS's control or exclusive to CMS's part of the building. Therefore, even if Sengul had directed the contractor to "focus solely on finishing [CMS]'s store," the certificate could not have been obtained sooner because the barriers to compliance were present throughout the building. Moreover, Sengul had his own independent motivation to bring the building into compliance as quickly as possible—he could not open his own store without obtaining a certificate of occupancy and he did in fact open his store on the same day that the temporary certificate was obtained. We therefore cannot agree with the superior court that Sengul could have "remed[ied] claimed defects" had Manus raised the rent abatement issue earlier. Because Manus's failure to mention the abatement provision until late July did not prejudice Sengul, we conclude that CMS did not implicitly waive its entitlement to rent abatement.

### C. The Superior Court's Damages Calculation

■■■ Because we conclude that CMS did not waive its right to abatement, we remand to the superior court to recalculate damages owed to CMS. Because CMS will still owe Sengul some unpaid rent even after abatement is applied pursuant to the terms of the lease,[40] we briefly consider Sengul's argument that the value of the amount of unpaid rent should be calculated using the yearly rental value rather than the monthly rental value. Specifically, Sengul maintains that due to the "unique nature of the businesses that lease this property," which is to cater to

tourists and remain open only during the summer months, any unpaid rent should be valued based on the yearly rental value.

We conclude that it is correct to use the monthly rental value in calculating unpaid rent. The lease required payments of "Ten Thousand dollars ($10,000.00) per month, through 5/31/2007." CMS still owed rent during the non-summer months, regardless of whether its store was open. Accordingly, CMS should not owe more than the lease's rental obligations require. Had the parties wished to do so, they could have drafted the lease to require that all rental payments be made during the summer, with no rental obligation during the off-season, but they did not do so and we decline to do it for them. CMS is only required to compensate Sengul for any unpaid rent as calculated based on the monthly rental amount.

### D. Other Issues

Sengul raises two additional issues on appeal—that CMS's work on the storefront did not constitute improvements that entitled CMS to a "refund" after Sengul's constructive eviction, and that the superior court failed to address Manus's personal liability. CMS urges that Sengul's briefing on these issues is inadequate. We agree that Sengul abandoned these issues because he failed to provide any more than cursory briefing devoid of citation to legal authority, and we do not consider them here.[41]

## V. CONCLUSION

We AFFIRM the superior court's determination that the lockout constituted constructive eviction. We REVERSE the superior court's conclusion that CMS waived its enti-

---

**39.** Indeed, the superior court recognized that "it is not clear whether the Certificate of Occupancy could have been obtained earlier regardless of effort."

**40.** Per the lease's terms, CMS is entitled to 83 days of rent abatement (May 15–31st = 17 days, multiplied by the three-day penalty = 51 days. June 1–8 = 8 days, multiplied by the four-day penalty = 32 days). Factoring in these 83 days, Sengul is entitled to unpaid rent from August 23

through the date of the constructive eviction, September 6.

**41.** See Jurgens v. City of North Pole, 153 P.3d 321, 326 (Alaska 2007) ("An issue is considered abandoned ... if the appellant inadequately briefs the issue."); A.H. v. W.P., 896 P.2d 240, 243 (Alaska 1995) (deeming points on appeal waived where the appellant "provide[d] no citation of legal authority" and made only "cursory and undeveloped" arguments).

tlement to rent abatement and REMAND for proceedings consistent with this opinion.

CHRISTEN, Justice, dissenting.

CHRISTEN, Justice, dissenting.

I write separately to express my disagreement with the court's conclusion that CMS did not waive its right to abatement.

As the court notes, in *Milne v. Anderson,* we held that an implied waiver may be demonstrated by either: (1) "direct, unequivocal conduct indicating a purpose to abandon or waive the legal right," or (2) "acts amounting to an estoppel by the party whose conduct is to be construed as a waiver."[1] The court also recognizes that a superior court's determination whether waiver occurred is a question of fact that we review for clear error.[2] In my view, the trial court's findings of fact support its ruling that Manus engaged in "direct, unequivocal conduct indicating a purpose to abandon or waive" the right to claim abatement.

After conducting a bench trial in this case, the superior court found that "[b]etween April and July, Sengul and Manus had a cordial relationship, although Manus paid neither the rent nor the deposit" and "Manus told Sengul on several occasions that he knew he was late with the rent and that he would shortly pay Sengul in full." The superior court found that Manus made statements in June and July like "I know I'm late. I'm going to pay you in full, and I'm going to make it up to you," and that Manus "did not invoke or mention the rent abatement provision of the lease to Sengul until raising it in late July, when Sengul began pressing for payment of rent." As the trier of fact, the superior court found that "it is most likely that Manus did not raise any rent abatement claim until pressed to pay the rent and security deposit because he was in default of his obligation to pay the security deposit and lacked the funds or desire to pay his bills."

In reversing the superior court's decision, our court finds support in its comparison of the facts of this case to the facts of *Dillingham Commercial Co., Inc. v. Spears,* where we held that one party's "long acquiescence" to a specific condition constituted a waiver of her rights under a lease.[3] The court compares the "long acquiescence" in *Dillingham Commercial* to the period at issue in this case—the interval between the signing of the lease and Manus's first mention of the abatement provision, in late July—and describes the latter as a period of "less than three months." A period of "less than three months" may not be significant in the context of some commercial leases, but viewed in the context of the short summer tourist season in Juneau, Manus's delay effectively wiped out Sengul's ability to collect rent for an entire year. As the superior court recognized:

> The reason for Manus['s] silence regarding the rent abatement clause likely has its root in the nature of the summer tourist season in Juneau and Manus['s] personal financial situation. Small stores in the prime tourist/cruise ship location, such as this small space, can garner annual rents of $126,000 per year, as with this lease, even though the stores are only open for approximately four months per year during the summer season and closed the remainder of the year. Thus, the "real" rent for such space when rented on an annual basis (or in this case five years) is effectively about $30,000–$40,000 per month for actual months of operation. When viewed in this light, early invocation of the rent abatement provision of approximately $31,759 was relative "small change" in view of the long-term lease.

Manus made no mention of the abatement clause until late July, and continued to operate his business in Juneau's "prime tourist/cruise ship location" storefront space until early September 2006 without paying rent. Predictably, after he vacated the premises, the space remained vacant until May 2007.

1. 576 P.2d 109, 112 (Alaska 1978).

2. *Miscovich v. Tryck,* 875 P.2d 1293, 1302 (Alaska 1994) (citing *Fun Prods. Distrib., Inc. v. Martens,* 559 P.2d 1054, 1058 (Alaska 1977)).

3. 641 P.2d 1, 8 (Alaska 1982).

Given the context of this lease, I view *Dillingham Commercial*'s reference to one party's "long acquiescence" as reinforcing the superior court's finding that Manus waived the right to claim rent abatement. The combination of Manus's statements that he had failed to pay rent, his acknowledgment that he owed rent, his repeated promises to pay the rent, and his failure to mention rent abatement until two-thirds of the tourist season had passed, support the superior court's finding that Manus waived the right to claim abatement. Because the record supports the superior court's findings of fact and conclusions of law, I respectfully dissent from the court's decision that Manus did not waive the right to abatement.